[Civ. No. 19212.   Second Dist., Div. One.   June 11, 1953.]

PHILIP S. EISENDRATH et al., Appellants, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Respondent.

Mitchell & Gold and Seymour Gold for Appellants.

Samuel B. Stewart, Jr., Hugo A. Steinmeyer, and Robert H. Fabian for Respondent.

WHITE, P. J.—Plaintiffs appeal from an adverse judgment in an action whereby they sought to recover the amount of a deposit in the defendant bank. The bank had exercised its right of ''offset'' by debiting the plaintiffs' account for $50,000, the limit of plaintiffs' guaranty upon accounts receivable of Empire Jewelry Company which had been bought by the bank.

Empire Jewelry Company, a corporation, of which plaintiff Philip S. Eisendrath was a stockholder and officer, on July 21, 1947, entered into an agreement with Bank of America, entitled ''Instalment Paper Indirect Collection,'' the pertinent provisions whereof are as hereinafter set forth.

The agreement recited that Empire Jewelry Company was in the business of retail selling and desired from time to time to sell to the bank notes, contracts, mortgages and other evidences of indebtedness, referred to in the contract and in the briefs as ''paper''; that the parties contemplated a ''future course of dealing'' and desired to define their mutual rights, obligations and liabilities. All paper, together with all rights of the seller (Empire Jewelry Co.) was to be assigned to the bank. Seller warranted that the paper was genuine, that the seller was the owner thereof, and that each paper represented a bona fide transaction. In consideration of the purchase of the paper by the bank, the seller guaranteed the payment to the bank ''of the total amount of principal and interest at the times and in the manner specified in each paper sold to the Bank.''

It was agreed that ''The purchase price of any paper purchased under this contract shall be 75% of the face value or unpaid balance of the principal amount of such paper. The said purchase price shall be paid to the Seller or credited to his account when the paper is purchased, and thereupon full title to the paper shall pass to the Bank.''

The rights of the bank and the seller with reference to the accounts so sold are set forth substantially as follows:

"If an amount in excess of the purchase price (75%) plus six per cent per annum computed monthly of the unpaid balance of the amount paid by the bank for such paper, is realized by the Bank, the amount so realized shall be applied as follows:

"(1) To satisfy any past due indebtedness of the Seller to the Bank, arising under this contract or otherwise; and

"(2) Any balance remaining shall be paid to the Seller. Such payments as become due the Seller hereunder shall be payable on the tenth (10th) day of each month during the life of this contract."

It was further provided that the bank "will immediately credit Seller with the value of paper calculated on the foregoing basis, provided, however, that Bank shall have ten (10) days from the date of deposit of each paper to make an investigation as to whether each such paper is satisfactory to it, and should it determine from such investigation that such paper is for any reason whatsoever unsatisfactory, upon request of Bank Seller will repurchase such paper for the amount with which Seller has been credited thereon."

By the terms of the agreement the bank appointed the Seller its agent for the purpose of receiving collections, such collections to be held in trust by the Seller. In the event of default by the Seller, upon notice, Seller's agency would terminate, but the Seller might repurchase any "paper" at a purchase price equivalent to its obligation to the Bank, "including Seller's contingent liability under this contract." The contract contained the following pertinent provisions:

"In the event of a violation by the Seller of any warranty made upon the sale of any paper, or the unlawful failure of Seller to account for any sum or sums collected by the Seller as agent for the Bank, the Bank shall not be required to give any notice of such default, and the agency of the Seller to collect the paper shall, at the option of the Bank, terminate. The Bank may at any time make any reasonable settlement with the obligor on any of such paper that it sees fit, or grant any extension of time thereunder that it may deem necessary, without notice to the Seller, and such settlement or extension of time shall not affect the obligation of the Seller to pay in full the entire principal amount of said paper with interest."

The plaintiffs herein, with other individuals, executed a "guaranty and waiver" which provided that they did "jointly and severally guarantee to the bank, its successors and assigns, the full, prompt and faithful performance and dis-

charge by Empire Jewelry Company" of the terms of the foregoing agreement, and guaranteed the full payment of all accounts sold or transferred to the bank thereunder. The guaranty further provided that, "The above agreement may be altered in any respect without releasing the undersigned from their liability hereunder. No extension in the time of payment or other indulgence or change in terms or amount of payment, made with any debtor, under any paper sold or transferred to the Bank shall release the undersigned from this guaranty."

On June 2, 1948, plaintiffs gave notice to the Bank that their guaranty was terminated as to future transactions. On June 15, 1948, after the bank had made written demand upon Empire Jewelry Company to pay the unpaid balance of contracts then delinquent as well as upon the guarantors, the bank, upon failure of any of the parties to respond, offset the sum of $50,000 from the deposit account of plaintiffs, appellants herein.

Appellants urge seven points:

"The bank holding the guarantee of the Eisendraths' (later their $50,000.00), and additional collateral as security for an obligation, has no lien thereon for payment of other claims against the principal."

Under this heading, it is urged that after the termination of the Eisendraths' guarantee, the Bank had no right of recourse upon them for the payment of "other claims" or future advances made by the Bank; that the Bank "closed the line of credit" at least by June 18; and that the burden of proof was upon the creditor Bank "to justify charges as being properly chargeable against the debtor or surety."

As a second point it is urged that the Bank failed to apply receipts from the securities to a reduction of the obligation guarantee.

Thirdly it is contended, "The sale and release of the security without demand, notice, consent, public sale, or opportunity to surety to protect self-released surety."

Fourthly, it is contended that "Alteration or Modification of the Contract or Obligation of Surety without His Consent Exonerates Surety."

As a fifth point, it is asserted that the bank negligently failed to obtain payment of the principal indebtedness when default had occurred, in that it failed to assert a banker's lien against the principal and continued to support and maintain the operations of the principal.

438

Further, it is urged that the bank made erroneous interest charges; and finally, that the court erred in not finding "that the proceeds of, and the securities remaining in the bank's possession after the bank indebtedness was paid off, belongs to the plaintiffs, and the amount of the proceeds of said securities ($5,700.00) reduced pro tanto the right of recourse against the plaintiffs' $50,000.00 and required judgment for plaintiffs on this point."

■ In the main, the answer to appellants' contentions is found in the terms of the waiver and guaranty and in the fact that under the terms thereof, at the time that the bank exercised its right of offset, the obligation of appellants to pay the $50,000 had fully matured. The Eisendraths had agreed to pay, on demand, the amount of any account not paid on or before its due date. At the time the bank made its demand on the Eisendraths, as well as other guarantors, there was delinquent paper in an amount of $265,560.63, or approximately 70 per cent of the total paper outstanding. In these circumstances, the bank was entitled to offset its deposit liability to its customers against the matured obligation under the guaranty. (Code Civ. Proc., § 440; *Gonsalves* v. *Bank of America,* 16 Cal.2d 169 [105 P.2d 118]; *Arnold* v. *San Ramon Valley Bank,* 184 Cal. 632, 635 [194 P. 1012, 13 A.L.R. 320]; *Melander* v. *Western Nat. Bank,* 21 Cal.App. 462, 469, 470 [132 P. 265]; *McDonald* v. *Gravenstein Apple Growers Co-op. Assn.,* 42 Cal.App.2d 329 [108 P.2d 936]; *Loeb* v. *Christie,* 6 Cal.2d 416, 418 [57 P.2d 1303]; *San Francisco Theological Seminary* v. *Monterey County Gas & Elec. Co.,* 179 Cal. 166, 172 [175 P. 693].) ■ As was said in the last-cited case, "The guarantor's obligation rests solely upon its contract of guaranty. The mortgage is looked to merely to interpret and measure the extent of the guaranty. The guarantor's obligation is not secured by the mortgage, and suit may be maintained upon it without reference to any proceeding against the principal debtor or the security."

Any contention that the bank was obliged to exhaust the security before any obligation arose on the part of appellants is answered by the language of *Loeb* v. *Christie, supra,* where the court said, at page 418: "On many occasions it has been declared by this court to be the rule that the guarantor's liability may be enforced without first resorting to the mortgage security."

The bank here undertook to make the advances upon the accounts in reliance upon the guaranty executed by plaintiffs.

The language in *McDonald* v. *Gravenstein Apple Growers Co-op. Assn., supra,* page 334, is here applicable: "Appellant has received the benefit of a considerable amount of the supplies furnished for the proper care of his property. He knew exactly what he was signing, and it can be reasonably inferred that respondents entered into the contract relying upon the fact that appellant had signed it in the capacity of guarantor. Both justice and equity require that appellant should reimburse respondent-Association."

We are in accord with the statement of respondent that events occurring after the offset was made could not operate to make the offset wrongful. Appellants appear to contend that the bank was under a duty to them to obtain enough money out of the accounts to recoup its investment and thus relieve them as guarantors from liability.

The evidence discloses that appellants' liabilities to which the $50,000 was applied were all liabilities upon transactions entered into prior to the notice of termination given by appellants to the bank on June 2, 1948. Further, the trial court came to the conclusion, upon substantial evidence, that assuming that the guaranty was effectively terminated as of June 2, 1948, there remained in existence on January 27, 1949, approximately $130,000 of liabilities which accrued before June 2, 1948, to which the $50,000 could have been applied.

Contrary to appellants' contention, no part of the $50,000 was applied to the satisfaction of any liabilities other than the accounts guaranteed by them. Between the date of the notice of termination of June 2d and the date of the offset, June 18th, the liabilities of Empire Jewelry Company to the bank did not increase, but actually decreased.

There was substantial evidence to support the court's findings to the effect that at all times from June 18, 1948, to January 27, 1949, there was in existence paper sold to the bank having an aggregate unpaid balance of more than $50,000, which was delinquent. At the time of the offset, June 18, 1948, the bank segregated delinquent paper having a face amount of $66,666.66 and "marked it" as "Eisendrath paper." The $50,000 was properly applied to pay the unpaid balances of this paper.

There is no merit to the contention, as we understand it, that the bank was required to apply the entire amount of the gross collections in reduction of the plaintiffs' obligation under their guaranty. As respondent points out, all sums realized from the paper were properly applied in accordance

with the contract; and even if the costs of collection had not been paid out of collections, the obligations of the guarantors at all times exceeded the amount of their guaranty (and there can be no question as to the good faith of the bank in the methods used by it to facilitate collections and liquidate the accounts.) Any suggestion that collection costs should not be charged against the amount recovered is obviously without merit, even without consideration of the explicit terms of the "instalment paper" contract and the plaintiffs' contract of guaranty.

That the bank properly applied the monies received by its collections through Empire Jewelry Company, or otherwise, finds support in *Bank of America* v. *Kelsey,* 6 Cal.App.2d 346 [44 P.2d 617], where it was held that payments received without designation as to which of several obligations should be credited must be applied, first to interest, second to principal due, third, to obligations earliest in date of maturity, fourth to obligations not secured by a lien or collateral undertaking; and fifth, to obligations secured by a lien or collateral undertaking. The court further held: ". . . And in this connection it should be stated that third persons, such as guarantors, sureties, indorsers and the like, secondarily liable on one or more of several debts, cannot control the application of a payment by either the debtor or the creditor, and where neither party applies the payment to a specific debt the court is not required to apply it so as to exonerate such third persons." (See, also, *Hogan* v. *Locke Paddon,* 91 Cal.App. 606, 616 [267 P. 392], and *Ohio Electric Car Co.* v. *LeSage,* 198 Cal. 705 [247 P. 190].) ▆ It follows that the monies received from the liquidation of the paper were properly applied to the payment of the unguaranteed advances rather than on the obligations guaranteed. As was said in *Consolidated Naval Stores Co.* v. *Wilson,* 82 Fla. 396 [90 So. 461, 21 A.L.R. 681, 689], ". . . it would be inequitable and manifestly unjust to require the application of the proceeds of the mortgaged property to be applied first to the endorsed notes, for the whole purpose of the *additional security* would be destroyed by such application." (Emphasis added.)

Despite the arguments of appellant as to the effect of the financial statements presented to the trial court, there was substantial evidence to support the conclusion that the bank in its entire operations with Empire Jewelry Company and its successor, accomplished no more than to recoup its investment plus the interest to which it was entitled. In these cir-

cumstances, in the light of the views hereinbefore expressed, appellants cannot prevail.

The argument of appellants, that the transaction was in essence a loan rather than a sale of contracts, is purely academic, in the light of the conclusions hereinbefore reached. No question of any attempt to avoid the usury law of this state, or any other rule of public policy, is or can be made. The contention that the basic contract with Empire Jewelry Company was altered without appellants' consent is answered by the plain language of the guaranty to the effect that the contract might be altered in any respect without releasing them from their liability.

With respect to the contention that $5,700 of the paper segregated as "Eisendrath paper" should have been awarded to appellants, it appears that such paper and its proceeds were offered to appellants on several occasions, but refused. The matter was not presented to the trial court until the motion for new trial was made. No request to amend the pleadings to determine the issue as between appellants and Empire Jewelry Company, Empire Home Equipment Company or the assignee for the benefit of creditors of Empire Jewelry Company, who were not parties to the action, was ever made. In the absence of pleadings, or a request to file the same, the finding of the trial court adverse to appellants was the only finding that could be made.

Finally, it must be once more observed that it is the duty of appellant to demonstrate that there is no substantial evidence to support a challenged finding (*Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550]; *Goldring* v. *Goldring,* 94 Cal.App.2d 643, 645 [211 P.2d 342]; *Tesseyman* v. *Fisher,* 113 Cal.App.2d 404, 407 [248 P.2d 471]). The record in this cause discloses substantial evidence to support all the trial court's findings, and under well settled principles the judgment must be affirmed.

For the reasons stated, the judgment is affirmed. The attempted appeal from the "ruling" denying the motion for a new trial is dismissed.

Doran, J., concurred.

A petition for a rehearing was denied June 29, 1953, and appellants' petition for a hearing by the Supreme Court was denied August 6, 1953.