[Civ. No. 25294.   Second Dist., Div. One.   Oct. 6, 1961.]

SAM KATZ et al., Respondents, v. JERRY HASKELL et al., Defendants; JACK ROCKWELL et al., Appellants.

[Civ. No. 25295.   Second Dist., Div. One.   Oct. 6, 1961.]

JERRY HASKELL et al., Respondents, v. JACK ROCKWELL et al., Appellants.

Rothman, Silver, Monosson & Hirsch for Appellants.

Frank Fishkin for Respondents in Civ. No. 25294.

Milton N. White and Richard C. Wulliger for Respondents in Civ. No. 25295.

LILLIE, J.—The present matters, in which separate judgments were rendered below, have been consolidated on appeal pursuant to stipulation of all parties; they arose, generally speaking, out of a series of transactions involving the same property, a 20-unit apartment building in the city of Burbank. Appellants Rockwell and respondents Katz and Haskell will be referred to hereinafter in the singular as Rockwell and Katz and Haskell respectively.

In each matter the background facts, all apparently without dispute, are briefly as follows: Prior to December 27, 1956, Rockwell was the owner of the real property in question. On that date he sold the building to Frances and Sanford Kohl, from whom he received a note for $32,500 secured by a third deed of trust as part of the purchase price. Thereunder payments of $350 or more were due on the 5th of each month, commencing February 5, 1957, and continuing until January 5, 1959, at which time the balance of principal and interest fell due. At the request of Rockwell, the following acceleration clause was included in the note: "In the event of a subsequent sale, the then remaining unpaid balance of principal and interest hereof shall immediately become due and payable in full." On May 28, 1957, Rockwell assigned the Kohl note to Katz for value as follows: "We hereby assign all our right, title and interest in and to this note with recourse and hereby guarantee the payments of this note as they become due to Sam Katz and Rose Katz"; concurrently therewith the deed of trust was also assigned to Katz. On October 10, 1957, the Kohls conveyed the property to Rockwell; shortly thereafter Rockwell conveyed the property to one Cerf who, on March 28, 1958, reconveyed it to Rockwell. Finally, on October 22, 1958, Rockwell conveyed the building to Haskell.

The action by Katz, in its essence, was against Rockwell as guarantors and assignors with recourse of the note secured by the deed of trust, said deed of trust being on property title to which was then vested in the name of Haskell (No. 25294). The companion matter (No. 25295) involved a cross-complaint by Haskell against Rockwell on the latter's alleged guaranty that a five-year extension on the trust deed would be obtained, or that Rockwell would purchase it and extend it for five years—Rockwell did neither. We shall consider the present matters in numerical order.

In No. 25294, on May 21, 1959, (five months after the note became fully due) the plaintiffs Katz sued to foreclose the third deed of trust on the property concerned; copies of the

various instruments just mentioned were attached to the complaint as exhibits. It was alleged that Haskell had purchased the building on October 22, 1958, and assumed payment of the note held by plaintiffs in the face amount of $32,500; it was further alleged that Haskell purchased the property subject to a first and second deed of trust both of which were prior to the third deed of trust owned by Katz. As of January 5, 1959, according to the complaint, Haskell was in default, at which time there was an unpaid balance of $24,016.61 in principal and interest; he had also defaulted, it was further alleged, in payments on the first and second deeds of trust. In addition to the defense of laches, Rockwell affirmatively alleged that their guarantee, if any, lapsed subsequent to October 22, 1958. Concurrently with the filing of the complaint, plaintiffs requested the appointment of a receiver to collect the rentals during the pendency of the foreclosure action; after a hearing on the order to show cause, a referee was appointed and entered into the performance of his duties; his final report was subsequently approved, including an award of receiver's and attorneys' fees pursuant to provisions therefor in the note. Upon judgment of foreclosure, which also declared that Rockwell was personally liable on the guarantee and assignment with recourse in the sum of $46,291.75, the property was ordered sold, and Katz was the successful bidder with a bid of $30,000. According to the receiver's report, after giving Rockwell credit for $30,000 (the amount of the Katz bid) and some cash on hand, there was a deficiency payable by Rockwell. The appeal is from those portions of the judgment holding Rockwell personally liable on the guarantee and assignment and awarding a deficiency judgment in favor of Katz.

The propriety of any deficiency judgment against him, says Rockwell, was one of the principal issues litigated below. Thus, Katz urged that Rockwell, not having paid the balance due on the guarantee of what was a purchase money obligation, was liable as an original maker of a nonpurchase-money obligation. Rockwell, however, argued that even if he were liable on the guarantee and notwithstanding other defenses urged, liability was fixed on the date of Haskell's default; therefore, he could not be liable to Katz for receiver's expenses, foreclosure costs and attorneys' fees, and, in addition be compelled to reimburse Katz for the monies advanced by him as payments on the first and second trust deeds. The correctness of this statement of the "issues" is challenged by

Katz. The issue, he says, is "not as to the obligation of the original maker but as to the obligation of the original guarantor and an independent indorser separate and distinct from the original transaction and a guarantor and indorser who creates his own transaction, receives a separate consideration, and guarantees and indorses his own transaction as distinguished from receiving a guarantee or indorsement from a third party in the original transaction." As for the claim that Rockwell's liability was fixed on the date of Haskell's default, respondents reply that the extent of Rockwell's liability on that date is controlling, and therefore it becomes immaterial that expenditures were made prior or subsequent to that date "so long as the expenditures made flowed from the liability so fixed."

Rockwell's first point is that if liability is predicated on that of an indorser, he was entitled to notice of dishonor and demand for payment. The trial court expressly found that "plaintiffs did not make presentment to defendants Rockwell nor was there notice, demand or protest," although the foregoing was qualified by the further finding that "prior to the due date defendants Rockwell again assured plaintiffs that on the due date the obligation would be taken care of" and "defendants conducted themselves with full knowledge of these facts" (lack of presentment, notice, demand or protest). While an indorser is not liable unless presentment is made and notice of dishonor given (Civ. Code, §§ 3151 et seq.), "a failure to make a timely presentation or give a timely notice of dishonor may be waived by the endorser. (Civ. Code, § 3190; *Fashion Hat Frame Co.* v. *Ringel,* 81 Cal.App. 556 [254 P. 275]; *Curtis* v. *Sprague,* 51 Cal. 239.)" (*Moore* v. *Trinity Oil & Gas Co.,* 149 Cal.App.2d 221, 223 [308 P.2d 31].) Section 3190, *supra,* provides that such waiver may be either "before" or "after" the date of notice has arrived. A witness, produced by Katz, testified that both before and after the due date he was told by Mr. Rockwell that payment would be made; for example, in February of 1959, after the maturity of the note, Rockwell told this witness, who was then acting as attorney for Katz: " 'Don't worry,' he said, and repeated again, 'I am on the guarantee. I will take care of it.' " Counsel for Rockwell say: "Nor was there any showing of waiver, except for the testimony of Kates" (the witness just mentioned). Such a self-stultifying statement ignores one of the basic principles of the appellate process that it is for the trial court to determine the credibility

of witnesses; it also overlooks the "substantial evidence" rule which has been spelled out in a legion of cases. We therefore pass on to the next assignment of error.

██ Rockwell challenges the trial court's determination that he was liable as a guarantor. After pointing out that the distinction between sureties and guarantors has been abolished in California (Civ. Code, § 2787), he invokes the provisions of section 2819, Civil Code, whereby a surety "is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, *without the consent of the surety* the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended" (emphasis added). We have emphasized the crucial language above for reasons immediately hereinafter appearing. The note in question provided for automatic acceleration in the event of a subsequent sale; as related earlier, there were four subsequent sales after the Rockwell-Kohl transaction in October of 1957. Rockwell argues that as to the first three (subsequent) sales, Katz waived the acceleration provision; he concedes, however, that the evidence is in conflict as to whether Rockwell had asked Katz to waive the particular clause upon the sale of the property to Haskell.

Finding Number 7 is as follows: "At the time of the conveyances from Kohl to Rockwell, Rockwell to Cerf, Cerf to Rockwell, no discussion was held nor any question raised by any of the parties to said conveyance or by the plaintiff herein as to enforcement or waiver of the acceleration clause or the effect thereof." Apparent from this finding is the trial court's view that Rockwell, who was a participant in all three of the above transactions, consented to a waiver by not making demand of the parties concerned (Kohl or Cerf) for balance of the payments due. Also, a witness for plaintiffs testified that at the time of the Haskell transaction Rockwell specifically requested a waiver from Katz of the acceleration clause. It is, therefore, properly urged by Katz that Rockwell did not consider that any former waivers by Katz, if there were such waivers, nullified Katz' right to exercise the waiver in the future—in other words, Rockwell's request for waiver of the acceleration clause indicated his consent, at the time of the Haskell sale, to a change in the contract. ██ In *Bloom* v. *Bender*, 48 Cal.2d 793 [313 P.2d 568], after quoting the language of section 2819, Civil Code, the Supreme Court declared: "The logical corollary to this statute is the exception

above noted; i.e., where the surety consents to an alteration of the original obligation of the principal, or the impairment or suspension of any of the creditor's rights or remedies against the principal, the surety is not exonerated." (P. 800.)

As further stated in the same case, ". . . if effective consent to the change in the obligation of the principal will prevent the otherwise resultant discharge of the surety, such consent may be given in advance of the alteration of the principal's obligation as well as at or after the time of such act." (P. 801.) The reasoning in *Bloom*, as well as the conclusions there reached, are controlling here.

Appellants' third point is stated as follows: "The failure of the holder to resort to the security by the most expeditious method, upon Haskell's default, and upon Rockwell's demand, exonerated Rockwell from liability to the extent of his injury." In this connection, reliance is placed principally on the provisions of section 2845, Civil Code: "A surety may require his creditors to proceed against the principal, or to pursue any other remedy in his power which the surety can not himself pursue, and which would lighten his burden; and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced." The point is discussed by Rockwell but briefly, and there is no reference to the facts at bar save for the state. ment that, "On the basis of Rockwell's testimony, it follows that under the law of guaranty, as revised by the legislature in 1939, Rockwell has been exonerated to the extent of his injury." However, there was testimony in this case additional to that produced by Rockwell, and it was contrary to his present claims; indeed, Mr. Rockwell himself admitted that he had more than ample funds with which to satisfy his obligations to Katz and therefore could have instituted his own foreclosure proceedings. Specifically, it appears that as early as February 15 Rockwell had secured refinancing of the third trust deed and was in a position to pay off Katz, take back the trust deed and immediately proceed with his own action. Rockwell also complains that there was an unreasonable delay in the institution of foreclosure proceedings by Katz which operated to his prejudice; this delay, if unreasonable, was contributed to by Rockwell's request not to proceed with foreclosure because it would spoil his pending negotiations for refinancing. It is, of course, statutory law that, "Mere delay on the part of a creditor to proceed against the principal, or to enforce any other remedy, does not exoner-

ate a surety." (Civ. Code, § 2823.) ▮ If this were not enough to show the fallacy of the present contention, "the necessity for diligence in prosecuting a claim against the principal debtor may be waived by the guarantor, and this waiver may be by parol agreement. [Citations.]" (*Berg Metals Corp.* v. *Wilson*, 170 Cal.App.2d 559, 573 [339 P.2d 869].)

▮ The fourth point on appeal raises the somewhat novel claim that as guarantor of a purchase-money obligation he is entitled to the protection of section 580b of the Code of Civil Procedure relating to deficiency judgments. Said section provides in pertinent part that "No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to secure payment of the balance of the purchase price of real property . . ." Rockwell points out that the statute does not say: "No deficiency judgment shall lie *against a purchaser* . . ."; instead, it is contended that the use of the language "in any event" impliedly protects any person who would be injured by the purchaser's default, in this case Rockwell as guarantor. Section 580b was first added to the code in 1933 (during the depression) as part of certain relief legislation. (*Kerrigan* v. *Maloof*, 98 Cal.App.2d 605, 614 [221 P.2d 153].) Rockwell relies on *Kerrigan*, specifically the following statements: ". . . the evils sought to be remedied and the purposes sought to be effected by the emergency legislation of 1933 and 1935 must be considered in construing section 580b. That section, and the related sections passed at the same time, were intended to prevent creditors from buying in property for a nominal sum, after the debtor had defaulted, and then holding the defaulting debtor for a large deficiency judgment. [Citations.] The 1935 amendment extended this protection to purchasers under a contract of sale. Undoubtedly, in private transactions, under this section there can be no deficiency judgment involving purchase money deeds of trust or mortgages, or contracts of sale. [Citations.]" (P. 616.) However, immediately thereafter the court went on to say: "But none of the evils sought to be overcome by section 580b existed in the case of partition or other types of judicial sales. The natural and normal construction of section 580b is that it only applies to contracts of sale where credit is involved. In the instant case the order confirming both the original and second sales provided the sale was for cash." (P. 616.) The instant transaction between Katz and Rockwell was likewise for cash;

the reasoning of *Kerrigan* would be more applicable if the present controversy were between Kohl and Rockwell where there was an initial contract of sale involving a note and a need of trust arising out of credit.

Further in connection with this same argument, Rockwell relies on the provisions of section 2809, Civil Code, that a surety's obligation "must be neither larger in amount nor in other respects more burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation." Pronouncements in *Loeb* v. *Christie*, 6 Cal.2d 416 [57 P.2d 1303], although the case involved a transaction occurring in 1930, are still persuasive (see *Eisendrath* v. *Bank of America*, 118 Cal.App.2d 434 [258 P.2d 13]); they do not support the view here taken by Rockwell. In *Loeb*, defendant appealed from an adverse judgment in an action on an unconditional guaranty of a promissory note secured by a trust deed; at the time of the suit, the power of sale therein given had not been exercised. The court declared: "Nor do we find anything in section 2809 of the Civil Code that requires a result different from that herein announced . . . Our conclusion does not cause the guarantor's obligation to be any heavier or more burdensome than that of the principal or maker of the note. The fallacy in appellant's theory is traceable to the erroneous premise upon which it is based. He confuses the obligation of the principal or maker of a mortgage or trust deed note with the remedy to enforce such obligation. The liability of the principal or maker of a note secured by mortgage or trust deed is for the face amount of the note . . . The obligation of the guarantor is no heavier or more burdensome, since he is liable for as much as, but no more than, the principal debtor or maker of the note . . . All that differs is the remedy against the guarantor but, under the authorities above cited, the obligation of the guarantor is separate and independent from that of the principal debtor, and the fund which the latter may have supplied for payment of his own obligation is not necessarily or logically available to the guarantor. . . ." (Pp. 419-420.) More recently, in *Stephenson* v. *Lawn*, 155 Cal.App.2d 669 [318 P.2d 132], the independent obligation of an endorser and the effect thereon of section 580b (as well as § 580d), Code of Civil Procedure, were brought into focus. There the defendants sold property to a third person; concurrently with the sale they took back a note secured by a second trust deed. Subsequently they trans-

ferred the note to plaintiffs to whom the second trust deed was also assigned. The holders of the first trust deed foreclosed, and plaintiffs thereafter sought recovery from the defendants as endorsers. As here, defendants contended that the action was essentially one for a deficiency judgment and therefore controlled by sections 580b and 580d. Said the court: ''As previously noted, this is not an action against the original maker or the party primarily liable. It is a suit against the defendants Lawn on their separate liability as endorsers and hence was a separate and distinct obligation and one which can in no way be construed as one for a deficiency judgment. As the court noted in *Hatch* v. *Security-First Nat. Bank,* 19 Cal.2d 254 [120 P.2d 869], the provisions of the Code of Civil Procedure above noted have to do solely with actions for recovery of deficiency judgments on the principal obligation after sale under trust deed as distinguished from an endorser's obligation. Thus, the only person coming within the protective provisions of those sections is the principal debtor.'' (P. 671.)

We conclude, therefore, that since (1) the transaction between Rockwell and Katz was for cash (as distinguished from a purchase-money obligation based on credit), and (2) there was no vendor-vendee relationship in the sense that the deed of trust was given for the full purchase price of the property, and (3) the obligations of guarantors and endorsers are separate and independent from those of the primary obligors, the provisions of section 580b may not be properly invoked.

Finally, Rockwell contends that the guaranty in question is one of payment and not of collection. Cited is *Chinn* v. *Penn,* 179 Cal. 153 [175 P. 687], which was also cited by appellant in *McConnell* v. *Herbert,* 2 Cal.2d 66 [38 P.2d 781]. As in the *McConnell* case, Rockwell claims that he should not be charged with receiver's and attorneys' fees and advances made by Katz. But the court in *McConnell* distinguished *Chinn* where, it appears, the contract of guaranty was made in relation to the note alone rather than in relation to the note *and* the deed of trust. Certainly the trial court was warranted in its view that the latter situation was within the contemplation of the parties at bar.

In No. 25295, Haskell went into possession of the subject apartment building following a written escrow contract whereby the parties undertook to exchange real property. As related in the companion matter (No. 25294), the apartment

building was subject to three promissory notes secured by trust deeds. Haskell remained in possession until June of 1959 when a receiver was appointed upon the request of Katz as guarantee-assignee of the note as well as the purchaser of the third trust deed securing the same. The escrow contract between the parties provided in part that ". . . Rockwell guarantees to second party, Haskell, either a 5-year extension on the third trust deed from the present due date or guarantees to buy the third trust deed himself and extend the same for five years from present maturity date, payable 1% per month or more, including interest at 6%." All payments on the first and second notes were made by Haskell except those due from and after February, 1959; all payments on the third note were likewise made except the balance due on January 5, 1959, the due date of said note and third trust deed.

No extension of the note and trust deed was secured by Rockwell. A monthly installment was tendered to Katz shortly after the due date, but it was refused. Thereafter, Katz commenced foreclosure action on the note and trust deed; a decree of foreclosure was obtained against Haskell and a deficiency judgment against Rockwell. Subsequently the property was sold.

During his possession of the subject property, Haskell made certain expenditures with respect thereto,[1] totalling $23,569. He received $5,687 in rentals through May of 1959, and hence his net expenditures were $17,882. In the foreclosure action Haskell cross-complained for this amount and was given judgment as prayed for. From this judgment Rockwell has appealed.

Haskell asserts that the only real question before this court is the measure of damages; Rockwell, however, renews certain arguments (rejected below), the first of which is to the effect that implicit in the extension agreement (in the escrow) was a covenant that he would not be called upon to obtain an extension if there was a default on the third trust deed or any of the prior trust deeds. The trial court concluded, with respect to this particular theory of the defense, that "there

---

[1]Down payment ............................$10,000.00
Escrow expenses ........................ 3,070.00
Note payments .. ...................... 4,576.00
Furniture (paid for but lost by Haskells) .. 2,867.00
Painting ......... .................... 1,893.00
Miscellaneous upkeep and repair .......... 1,163.00

$23,569.00

is no term other than those expressed in writing in the written escrow agreement conditioning the Rockwells' performance of their guarantee or requiring Haskells to perform.''

Although Rockwell's brief, under various headings, discusses the problem in its several aspects, there is fundamentally but one issue for determination here, and it is this: Was there some term or condition in the pertinent portion of the escrow contract which would defeat Haskell's claims on his cross-complaint? Certainly there was no *express* condition —the written instrument is silent with respect thereto, and no evidence was received of any oral understanding of any such condition. Indeed since the 1937 amendment of the statute of frauds to provide that an agreement by a purchaser of real property to pay an indebtedness secured by a mortgage or trust deed is invalid unless in writing, it is apparently no longer possible to have a binding oral agreement to assume the debt (33 Cal.Jur.2d, Mortgages, § 266).

But was there an *implied* condition as contended for by Rockwell? Several considerations militate against such a claim. First, the parol evidence rule prohibits the implication of such a condition into a written contract: ''The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.'' (Civ. Code, § 1625.) Again, ''When a contract is reduced to writing the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this title.'' (Civ. Code, § 1639); and section 1698 of the Civil Code provides that ''A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise.''

In *Totten* v. *Underwriters at Lloyd's London,* 176 Cal.App.2d 440, 444 [1 Cal.Rptr. 520], the trial court, as here, had necessarily to consider that '' 'in the construction of a contract, the office of the court is simply to ascertain and declare what, in terms or in substance, is contained therein, and not to insert what has been omitted or omit what has been inserted. (Code Civ. Proc., § 1858.)'' In Witkin, California Evidence, section 368, the text writer says: ''If . . . an attempt is made to show that *one of the terms of a contract* is not to take effect until the condition happens, or that the obligations, in whole or in part are to be absolved by the operation of a *condition subsequent,* the parol evidence rule is a bar; for once the existence of a legally effective contract

is admitted its terms cannot be varied or defeated by any extrinsic evidence.'' ■■■ See also *Buffalo Arms, Inc.* v. *Remler Co.*, 179 Cal.App.2d 700, 710 [4 Cal.Rptr. 103], to the effect that ''parol evidence cannot be admitted to add another term to the agreement, although the writing contains nothing on the particular one to which the parol evidence is directed.''

■■■ Next, since the intent to create a condition must appear expressly or by. clear implication (*Lowe* v. *Copeland,* 125 Cal.App. 315, 321 [13 P.2d 522]), it is not favored in law. Rockwell cites no authority for his statement that the implication of ''no senior liens'' is common. There is likewise no citation of authority for his further statement that this type of clause is customary—custom is implied only if it is considered in law or usage as incidental to a contract. (12 Cal.Jur.2d, Contracts, § 132.)

Because it is not looked upon with favor in the law, a forfeiture can never take place by implication; it must be effected by express and unambiguous language. (12 Cal.Jur.2d, Contracts, § 174.) If the term contended for by Rockwell were made a part of the contract by implication, the result would be to destroy all of Haskell's rights—not only would Haskell have lost the property in question, but he would have no right to recover damages for Rockwell's breach of contract.

Finally, various rules of construction bar any implication of the terms here claimed. A contract is construed in favor of giving it effect. (Civ. Code, §§ 1643 and 3541.) A contract is construed against the promisor or grantor—the subject property was granted by Rockwell to Haskell as was also a promise to do certain things. (Civ. Code, §§ 1654 and 1069.) The purpose of construction is to explain and not add or subtract terms. (Witkin, California Evidence, *supra,* p. 410.)

As noted already, related areas of this, Rockwell's principal defense, are explored and discussed by his counsel—and by counsel for Haskell in reply thereto. However, we agree with respondent that if the condition or term may not be validly supplied, there is really no need to go any further, and any consideration of these related points would be simply academic. ■■■ We do, nonetheless, consider one additional assignment of error by Rockwell to the effect that Haskell's action was premature. Citing *Bank of America* v. *Casady,* 15 Cal.App.2d 163 [59 P.2d 444], Rockwell argues that Haskell had no cause of action for special damages for failure to loan money until his equity of redemption had expired. In the

first place, the cited case is distinguishable on its facts; secondly, prematurity is only a plea in abatement raised by answer and Rockwell's answer is silent with respect to this defense. (See *Fireman's Fund Indem. Co.* v. *Knorr*, 117 Cal. App.2d 761 [256 P.2d 1005].) Haskell, of course, had every right to proceed herein by way of cross-complaint.

"Where several persons are sued upon a demand, against which one defendant has agreed to indemnify another, the latter may have his rights to indemnity determined by means of a cross-complaint." (*Television Arts Productions, Inc.* v. *J. Fairbanks, Inc.*, 134 Cal.App.2d 293, 297 [285 P.2d 695].)

The sole remaining question is whether the trial court's award of damages to Haskell was proper and in the proper amount. Ordinarily, a plaintiff may not recover damages for a liability incurred by him with respect to a third party, as a result of the defendant's wrongful act, until he satisfies the liability in question—the existence of mere liability not necessarily being regarded as the equivalent of actual damage; however, where the plaintiff's liability to the third party exists as the result of a previous act on the part of the plaintiff, and where the defendant, for adequate consideration, has agreed to discharge the plaintiff's obligation to the third party, the defendant will, in the event of breach by him, be liable in damages therefor, even though plaintiff himself has not satisfied the obligation at the time of commencing the action. (14 Cal.Jur.2d, Damages, § 18.) In the case at bar, of course, the obligation was the third trust deed. It appears to be the uniform rule that where a defendant agrees to loan, or extend credit, or pay a debt, and thereafter breaches, the plaintiff may recover damages for the resulting loss of his property. (25 C.J.S., Damages, § 79e, p. 588.)

There was testimony that Rockwell knew that Haskell did not have the money to pay off the note. The latter tried to get the money elsewhere but was unsuccessful. It is certainly a fair inference that Rockwell must have known that the loss of the property would follow, particularly since it was already so heavily encumbered. Section 3300 of the Civil Code provides that "the measure of damages [for breach of contract] . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be

likely to result therefrom." Of the three different measures of damage used by the courts,[2] the trial court selected that which awarded plaintiff the net expenditures made by him with respect to the property, which actually resulted in a smaller award than would have been the case if either of the two approaches to the problem, mentioned below, had been followed.

The various expenditures by Haskell have previously been listed. He testified as to what money went in and what went out. Possibly Haskell kept poor records, but the burden of proving any mitigation of damages was on Rockwell (14 Cal. Jur.2d 734) and very little evidence of any kind was forthcoming by Rockwell on the issue of damages generally. Under the circumstances, factual questions were presented, and the determination of such questions is conclusive on appeal.

For the reasons stated, the portions of the judgment appealed from in No. 25294 are affirmed; in No. 25295 the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

---

[2]Another measure of plaintiff's loss is the equity value of the property, i.e., the market value at the time of loss, less the amount of encumbrances thereon. (*Hopewell Bldg., Inc.* v. *Callan,* 200 App. Div. 588 [193 N.Y.S. 504].) Still another is the amount necessary to redeem, i.e., the amount of the foreclosure sale price (34 Cal.Jur.2d 437).