Filed 9/15/20

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| AEROTEK, INC., | C078435 |
| Plaintiff, | (Super. Ct. No. 34200700540602CUBTGDS) |
| v. | |
| JOHNSON GROUP STAFFING COMPANY, INC., | |
| Defendant and Appellant; | |
| PORTER SCOTT, P.C., | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Alan G. Perkins, Judge.  Affirmed.

Cassinat Law Corporation, John E. Cassinat and Ronald L. Carello for Defendant and Appellant.

Porter Scott, Carl J. Calnero, Thomas L. Riordan and David E. Boyd; David E. Boyd Law Offices and David E. Boyd for Real Party in Interest and Respondent.

1

California's Uniform Trade Secrets Act allows courts to award reasonable attorney fees and costs to the "prevailing party" in certain cases involving bad faith claims. (Civ. Code, § 3426.4.)[1] The issue here concerns the ownership of fees awarded under this statute. Is the prevailing litigant (here, The Johnson Group Staffing Company, Inc.) or the prevailing litigant's attorney (here, Porter Scott, P.C.) entitled to the fees awarded to the "prevailing party"? We conclude that, absent an enforceable agreement to the contrary, these fees belong to the attorney to the extent they exceed the fees the litigant already paid. We further conclude that, although the parties here entered into a fee agreement, that agreement did not alter the default disposition of fees in favor of the attorney. Because the trial court found likewise, we affirm.

BACKGROUND

I

*Porter Scott's Representation of TJG*

Porter Scott, P.C. (hereafter, "Porter Scott") defended The Johnson Group Staffing Company, Inc. (hereafter, "TJG" or "Johnson Group") through two rounds of litigation with its chief competitor, Aerotek, Inc. (hereafter, "Aerotek"). Aerotek first sued TJG after TJG's founder, Chris Johnson, left Aerotek to form TJG. In the lawsuit, Aerotek alleged that TJG and Johnson, among other things, misappropriated trade secrets by soliciting Aerotek's customers. TJG and Johnson settled with Aerotek a little over a year later.

Shortly after the settlement, Aerotek sued again—this time related to TJG's hiring of one of Aerotek's employees, Michael Ponce. Raising claims similar to those in its first complaint, Aerotek alleged that TJG and Ponce, among other things, misappropriated trade secrets by soliciting Aerotek's customers.

---

[1] Undesignated statutory references are to the Civil Code.

Unlike the first suit, Aerotek's second suit dragged on for a number of years, at great cost to TJG. Two years into the litigation, TJG was nearly bankrupt. Its income fell as some clients left for fear of becoming entangled in the litigation, and its costs rose as it incurred tens of thousands of dollars in legal fees.

As TJG's finances deteriorated, Porter Scott moved to withdraw as counsel following the nonpayment of over $90,000 in legal fees. The trial court later granted the request. But only days after the court granted the motion to withdraw, Porter Scott agreed to represent TJG "on a modified Pro Bono basis" going forward—which meant TJG would pay Porter Scott's costs (e.g., filing fees and postage) but would not need to pay attorney fees. The agreement added as relevant here:

4. That the parties to the Retainer Agreement acknowledge that Chris Johnson and The Johnson Group through approximately November 30, 2009 were indebted to the Porter Scott firm in the approximate sum of $92,845.86.[1]

   [Footnote] 1: Should the Johnson Group or Chris Johnson be awarded fees in the future based on Porter Scott's underlying representation, all fees shall be reimburseable [*sic*] at that point and this waiver shall not apply.

5. That in order to re-engage as counsel of record, the Porter Scott firm has agreed to accept $25,000.00, due and payable immediately, receipt of which is hereby acknowledged, and further agrees to handle the remaining portions of the litigation on a modified Pro Bono basis. The remaining balance due and owing as of November 30, 2009 will be waived. The Johnson Group and Chris Johnson will remain responsible for all future costs of litigation and will execute a further legal services agreement detailing those matters.

6. That Chris Johnson and The Johnson Group hereby release and discharge the Porter Scott firm from any and all claims or liabilities, damages or for any claim whatsoever relating to the Porter Scott firm's handling of the *Aerotek v. The Johnson Group, et al.* Case No. 34-2007-00540602-CU-BT-GDS prior to November 23, 2009.

The parties' agreement also included an integration clause, stating: "This Agreement contains the entire agreement of the parties. No other agreement, statement,

3

or promise made on or before the effective date of this Agreement will be binding on the parties."[2]

Under the new agreement, Porter Scott defended TJG through two jury trials. In the first, a jury found in part in favor of Aerotek and awarded it $40,000 in damages. But the trial court later set aside the verdict after granting Aerotek's motion for a new trial. In the second trial, the jury rejected all Aerotek's claims. The court afterward entered judgment on the verdict, which Aerotek later appealed.

While the appeal was pending, Porter Scott moved for attorney fees pursuant to section 3426.4. The court agreed fees were warranted and awarded $735,781.27 in attorney fees to TJG. Aerotek later appealed that decision too.

II

*Porter Scott's and TJG's Dispute Over Awarded Fees*

Shortly after the court's fee award, Porter Scott and TJG parted ways following a dispute over who was entitled to the awarded fees. Believing it was entitled to most of the award, Porter Scott asked the court to modify the award—which initially only noted TJG's entitlement to the award—to note TJG and Porter Scott's joint entitlement to the award. The court granted the request and then scheduled a jury trial to determine who was entitled to the fee award. But on the scheduled date for trial, the parties decided to postpone the matter until Aerotek's two appeals were resolved.

Two years later, after Aerotek lost its two appeals, Aerotek wired the full fee award to TJG. The trial court afterward, following the parties' stipulation, directed TJG to place the funds in a blocked account. The court then, departing from the earlier plans

---

[2]    Porter Scott contends the parties' agreement was based "on a form suggested by the [California] State Bar." It then asks, in a footnote, that we take judicial notice of the California State Bar's sample fee agreement. We deny the request. The appropriate procedure for requesting judicial notice is through a motion, not a footnote. (Cal. Rules of Court, rule 8.252(a).)

for a jury trial, decided to hear the parties' dispute over the award as a law and motion matter.

TJG and Porter Scott afterward submitted briefs in support of their respective positions. Porter Scott contended, based on case law discussing other statutorily awarded fees, that attorney fees awarded under section 3426.4 are presumptively vested in the litigant's attorney, not the litigant. It also asserted that the parties' agreement further supported the conclusion that it, and not TJG, was entitled to the fee award.

TJG disagreed. To begin, for two alternative reasons, it argued the court should not even rule on the merits of the parties' dispute. First, it contended a jury, not the court, should decide the matter. But if the court disagreed, it suggested it would elect to arbitrate the dispute under California's Mandatory Fee Arbitration Act (Bus. & Prof. Code, § 6200 et seq.)—an act that, in general, allows clients to demand arbitration in fee disputes. Turning next to the merits, TJG offered a competing view of the parties' agreement. According to TJG, Porter Scott agreed to provide its services without pay or any right to attorney fees in order to avoid being sued for malpractice. TJG's argument tied back to the advice that Porter Scott offered around the time TJG hired Ponce. In TJG's view, Porter Scott might have committed malpractice in failing to advise TJG about Business and Professions Code section 16607 at the time of Ponce's hiring. That section provides that an employment company's customer list "constitute[s] a trade secret and confidential information of . . . the employment agency," but adds that a former employee's use of its prior employer's customer list is not unlawful if over a year has passed since the employment relationship ended. TJG contended that, had it known of this provision, it would not have hired Ponce directly from Aerotek. TJG then reasoned that Porter Scott, fearing a potential malpractice suit for its ill advice, agreed to enter into the pro bono agreement to avoid that issue.

After hearing from the parties, the court ruled in Porter Scott's favor. It first rejected TJG's arguments concerning its alleged right to a jury trial and, alternatively,

5

mandatory arbitration.  It then found Porter Scott had the better argument on the merits.  The court awarded the full amount of the fees to Porter Scott—which, with interest over the years, had increased to $917,811.48—"minus the amounts subject to TJG's right to be reimbursed for amounts already paid by TJG to Porter Scott."  The court later calculated that TJG was entitled to $89,873.31 "plus 10% of any accrued interest earned in" the account holding the fee award, and that Porter Scott was entitled to $827,938.17, "plus 90% of any accrued interest earned in" the account.  TJG timely appealed.

## DISCUSSION

Section 3426.4 is part of California's Uniform Trade Secrets Act.  Relevant here, it provides:  "If a claim of misappropriation is made in bad faith, . . . the court may award reasonable attorney's fees and costs to the prevailing party."  The question here concerns not the propriety of an award of fees under this statute, but the ownership of the statutory award:  Should the prevailing litigant (here, TJG) or the prevailing litigant's attorney (here, Porter Scott) receive the awarded fees?

To answer that question, we take an approach similar to the one employed by the California Supreme Court in *Flannery v. Prentice* (2001) 26 Cal.4th 572 (*Flannery*).  The court there considered a question similar to our own:  "[T]o whom, as between attorney and client, [do] attorney fees awarded under Government Code section 12965 . . . belong when no contractual agreement provides for their disposition."  (*Id.* at p. 575.)  At the time, and as relevant to the case, Government Code section 12965 provided:  " 'In actions brought under this section, the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs, including expert witness fees, except where the action is filed by a public agency or a public official, acting in an official capacity.' "  (*Flannery,* at p. 575, fn. 1.)  After considering this statutory text, the legislative intent behind the statute, and several policy considerations, the court "conclude[d] that attorney fees awarded pursuant to [Government Code] section 12965 (exceeding fees already

6

paid) belong, absent an enforceable agreement to the contrary, to the attorneys who labored to earn them." (*Id.* at p. 590.)

Although we find this to be a closer case, we interpret section 3426.4 similarly. We thus conclude that attorney fees awarded under section 3426.4 (exceeding fees the client already paid) belong to the attorneys who labored to earn them, absent an enforceable agreement to the contrary. And although the parties here entered into a fee agreement, we find their agreement did not alter section 3426.4's default disposition of awarded fees in favor of the attorney.

I

*Disposition of Fee Awards Under Section 3426.4*

A. *Statutory Language*

"We begin our inquiry by examining section [3426.4's] words, giving them a plain and commonsense meaning." (*Flannery*, *supra*, 26 Cal.4th at p. 577.)

Our textual reading, following the *Flannery* court's approach, turns largely on the words "attorney's fees." Reading section 3426.4 to vest awarded "attorney's fees" in counsel would be consistent with the ordinary view that attorney fees compensate attorneys, not litigants. (See *Flannery*, *supra*, 26 Cal.4th at p. 578.) Reading the statute to vest fee awards in litigants, on the other hand, would at times stray from that ordinary understanding of attorney fees. After all, "[a]n award that does not compensate the litigant for payments made to, owed to, or forgiven by an attorney or attorneys is, in one sense, not an 'attorney's fee' at all." (*Id.* at pp. 578-579, fn. omitted.) Considering the statutory text alone, then, we lean in favor of the view that "attorney's fees" awarded under section 3426.4 (exceeding fees already paid) are for attorneys, not litigants.

In support of its contrary reading, TJG makes much of the fact that section 3426.4 authorizes awards of attorney fees to the "prevailing party," which TJG presumes means the litigant. TJG bases its argument on several cases that awarded fees under section 3426.4 to a named party. But each of TJG's cited cases concerned only whether attorney

7

fees should be awarded at all, not whether the litigant or the litigant's attorney should receive that award.  (See *SASCO v. Rosendin Electric, Inc.* (2012) 207 Cal.App.4th 837, 840; *FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1273; *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1253.) These cases thus offer no support to TJG's position.  (See *Flannery*, *supra*, 26 Cal.4th at p. 581 [" ' "an opinion is not authority for a proposition not therein considered" ' "].) More relevant to our inquiry are cases dealing with the actual type of issue before us— whether the litigant or the litigant's attorney should receive awarded fees.  And these cases have rejected the view that the "prevailing party" necessarily means the litigant.  As the *Flannery* court explained, a statutory award to the "prevailing party" does not "unambiguously favor" the litigant over the litigant's attorney.  (*Id.* at p. 578.)  " 'In the countless procedural statutes in which the term "party" is used, it is commonly understood to refer to either the actual litigant or the litigant's attorney of record. [Citations.]  Since that is the ordinary import of the term, that is the meaning we must ascribe to it when used in [a statute], unless the Legislature has clearly indicated a contrary intent . . . .' [Citations.]"  (*Ibid.*)

But although we conclude that section 3426.4's text tends to favor Porter Scott, we find the statute " 'sufficiently ambiguous to warrant our consideration of evidence of the Legislature's intent beyond the words of the statute.' [Citation.]"  (*Flannery*, *supra*, 26 Cal.4th at p. 579.)  We thus turn next to "extrinsic information, including the statute's legislative history and underlying purposes."  (*Ibid.*)

B.  *Legislative Intent*

At this stage of our review, as we look to extrinsic information, Porter Scott's claim to the fees becomes somewhat weaker than the attorney's claim in *Flannery*.

The court in *Flannery*, after considering the text of Government Code section 12965, reviewed the broader statutory scheme to which the statute was a part—the California Fair Employment and Housing Act (FEHA).  (*Flannery*, *supra*, 26 Cal.4th at

8

pp. 579-584.)  And based on its review of this statutory scheme, the court found that interpreting Government Code section 12965 in favor of the litigant's attorney would further the Legislature's intent in enacting FEHA.  That was in large part because that statute, if interpreted in the attorney's favor, would incentivize attorneys to take on more cases challenging employment discrimination—which would further an express purpose of FEHA to eliminate employment discrimination.  (*Flannery,* at pp. 582-584.)  But interpreting section 3426.4 in favor of Porter Scott (or TJG, for that matter) does not further a similar express purpose of the Uniform Trade Secrets Act.  We cannot say, for example, that incentivizing attorneys to defend misappropriation claims made in bad faith would further an express purpose of the act.  We thus find this review does little to advance our resolution of the parties' dispute.

We also find review of the legislative history to section 3426.4 of limited help.  As this history shows, the Legislature enacted section 3426.4 as part of its effort to adopt the uniform trade secrets law recommended by the National Conference of Commissioners (Commissioners).  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 501 (1983-1984 Reg. Sess.) as amended April 21, 1983, p. 2.)  In 1979, these Commissioners recommended that states adopt, as relevant here, a statute providing:  "If (i) a claim of misappropriation is made in bad faith, . . . the court may award reasonable attorney's fees to the prevailing party."  (14 West's U. Laws Ann. (2005) Trade Secrets Act, § 4, p. 642.)  The California Legislature afterward adopted that language verbatim, apart from the "(i)," in section 3426.4 in 1984.  (Stats. 1984, ch. 1724, § 1.)  But the Legislature said little of its intent in doing so, other than the general intent to adopt the recommended uniform law.  (Assem. Com. on Judiciary, *supra*, p. 2.)

The Commissioners, on the other hand, did offer a specific reason for this type of statute:  it would serve " 'as a deterrent to specious claims of misappropriation . . . .' [Citation.]"  (*Stilwell Development, Inc. v. Chen* (C.D.Cal. Apr. 25, 1989, No. CV86-4487-GHK) 1989 U.S. Dist. LEXIS 5971, p. *9, italics omitted.)  And that stated

9

purpose, on the logic of the *Flannery* court, offers at least some support for Porter Scott's reading of section 3426.4. The statute considered in *Flannery*, again, authorized the award of attorney fees to "prevailing parties" in certain FEHA actions. Although the court there generally focused on fee awards to prevailing plaintiffs under that statute, it also discussed the ability of prevailing defendants to obtain fee awards when "forced to defend frivolous suits." (*Flannery*, *supra*, 26 Cal.4th at p. 585.) And in that discussion, the court found, construing the statute to vest awarded fees in defense counsel, rather than defense counsel's client, would "further the important public policy of discouraging frivolous suits." (*Ibid.*) On that same logic, construing section 3426.4 to vest fees in defense counsel, rather than defense counsel's client, would similarly "further the important public policy of discouraging [specious claims of misappropriation]"—and would thus further the Commissioners' stated intent in recommending this type of statute. And because construing section 3426.4 in a manner consistent with the Commissioners' intent is favored, all things being equal, we find this consideration tips in favor of Porter Scott. (See *Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 222 [courts should "accord substantial weight to the commissioners' comment on the construction of what is now" the Uniform Trade Secrets Act].)

    C. *Public Policy*

Moving beyond the legislative history, we consider next those "important public policies" discussed in *Flannery*. (*Flannery*, *supra*, 26 Cal.4th at p. 584.) And here we find some of the strongest support for finding that attorneys, absent some agreement, are entitled to attorney fees awarded under section 3426.4.

The *Flannery* court discussed five "important public policies" it found were advanced by "[c]onstruing [Government Code] section 12965 as vesting ownership of unassigned attorney fees awarded thereunder in counsel rather than the litigant (to the extent fees are not otherwise paid)." (*Flannery*, *supra*, 26 Cal.4th at p. 584.)

10

First, the court found this reading would "[e]ncourage representation of legitimate FEHA claimants and discourage nonmeritorious suits." (*Flannery*, *supra*, 26 Cal.4th at p. 584.)  According to the court, "construing [Government Code] section 12965 to vest ownership of fees awarded thereunder in counsel when, for whatever reason, no contract exists disposing of them, thus diminishing the risk of noncompensation or undercompensation, will enhance the likelihood that attorneys who undertake FEHA cases will be fully compensated, and to that extent will enhance the fee provision's effectiveness in encouraging counsel to undertake FEHA litigation." (*Id.* at pp. 584-585.)  And, the court added, because defendants too can obtain fees when "forced to defend frivolous suits," "construing [Government Code] section 12965's attorney fee provision to assure compensation of attorneys who successfully represent FEHA litigants will further the important public policy of discouraging frivolous suits as well." (*Id.* at p. 585.)  This latter point is particularly noteworthy here.  If construing Government Code section 12965 to vest ownership of fee awards in defense counsel rather than defense counsel's client would "further the important public policy of discouraging frivolous suits," we see no reason why the same should not also be true here.

Second, the *Flannery* court found construing the statute in favor of the attorney would avoid unjust enrichment.  (*Flannery*, *supra*, 26 Cal.4th at p. 585.)  "Without concluding that such reasoning would hold in every context," the court found it "evident that, in general, where attorney compensation has neither been paid nor forgiven and there is no contract assuring it, allowing a victorious litigant to retain the proceeds of a fee award (in addition to a substantial damages judgment) would confer an unjustified windfall." (*Id.* at p. 586.)  This consideration too, we find, tips in favor of Porter Scott. Awarding the fees to Porter Scott would compensate them for services rendered.  But awarding the fees instead to TJG would result in a large windfall—a result courts tend to disfavor.  (See *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1091 ["California courts are justifiably reluctant to construe statutes to

11

confer a windfall."].)  We thus find this consideration favors construing section 3426.4 in support of Porter Scott's position.  And we find that to be the case even though Porter Scott agreed to provide most of its services pro bono—something that TJG deems significant.  As the *Flannery* court recognized, even attorneys who perform services pro bono may obtain "reasonable" attorney fees under a fee-shifting statute.  (*Flannery*, at p. 585.)

Third, the *Flannery* court found construing the statute there to favor the attorney would ensure fairness.  (*Flannery*, *supra*, 26 Cal.4th at p. 586.)  "Vesting ownership of unassigned [Government Code] section 12965 fees in counsel rather than the prevailing litigant (to the extent fees are not otherwise paid) is fairer than the alternative to the litigants who must pay such fees." (*Ibid.*)  That is so, the court reasoned, because a litigant forced to pay these fees to the opposing party's counsel would only be paying litigation costs.  But if instead this litigant were forced to pay these fees to the opposing party, who had incurred no costs, the fees "would, from the perspective of those paying them, transform . . ., without legislative authorization, into a kind of punitive damages." (*Ibid.*)  Because that same logic is equally applicable here, we find it lends further support to Porter Scott's reading of section 3426.4.

Fourth, the court found its construction of Government Code section 12965 would address ethical concerns.  (*Flannery*, *supra*, 26 Cal.4th at p. 586.)  With exceptions not relevant here, California attorneys cannot "share legal fees directly or indirectly with a nonlawyer." (Rules Prof. Conduct, rule 5.4(a).)  Based on an earlier version of this rule, the court found construing Government Code section 12965 in the plaintiff's favor "would implicate in some measure the policy our fee-splitting prohibition is designed to advance"—though the court did not resolve whether this construction would in fact conflict with the fee-splitting prohibition.  (*Flannery*, at p. 587.)  We, similarly, need not resolve whether TJG's favored construction of section 3426.4 would in fact conflict with the prohibition against fee-splitting.  But we note, like the *Flannery* court, that TJG's

12

position at least "implicate[s] in some measure the policy our fee-splitting prohibition is designed to advance." (*Flannery*, at p. 587.) And, following the *Flannery* court's approach, we find consideration of ethical issues thus favors construing section 3426.4 in favor of attorneys.

TJG, reading *Flannery* differently on this point, contends "the express holding in *Flannery*" was that attorneys could split awarded fees with their clients without violating the ethical rules on fee-splitting. TJG bases this contention on a footnote in which the *Flannery* court said: "In general, 'allowing lawyers to contract with their clients for an assignment of the right to fees should enhance the public's access to competent counsel.' [Citation.]" (*Flannery*, *supra*, 26 Cal.4th at p. 588, fn. 16.) We agree this comment suggests attorneys can contract with their clients to split awarded fees. But that said, the court never resolved whether attorneys who do so would violate the ethical rules on fee-splitting. Instead, it only noted that construing Government Code section 12965 in the plaintiff's favor "would implicate in some measure the policy our fee-splitting prohibition is designed to advance." (*Flannery,* at p. 587.) And on that basis, the court found construing Government Code section 12965 to vest fees in counsel would "[a]ddress ethical concerns." (*Flannery,* at pp. 586, 584.) We see no reason to find differently here.

Fifth and finally, the court found that construing Government Code section 12965 to award fees to litigants rather than their counsel, absent an agreement to the contrary, would wrongly punish attorneys who fail to secure written fee agreements. (*Flannery*, *supra*, 26 Cal.4th at pp. 588-589.) According to the court, ordering fee awards under this statute to "be paid directly to plaintiffs whenever there exists no contrary agreement between plaintiffs and their counsel (such that plaintiffs realize a windfall at counsel's expense) could make sense only if the law treated attorneys who fail to secure fee agreements as deserving of such punishment." (*Id.* at p. 589.) But because the court found no evidence of this type of punitive intent, it declined to interpret Government

Code section 12965 in this fashion.  (*Flannery,* at pp. 589-590.)  We find that reasoning fitting here as well.  To find otherwise, the *Flannery* court's reasoning, "could make sense only if the law treated attorneys who fail to secure fee agreements as deserving of such punishment."  (*Id.* at p. 589.)  But we find no such intent to punish in section 3426.4.

Taking these various considerations together, we conclude that attorney fees awarded pursuant to section 3426.4 (exceeding fees already paid) belong, absent an enforceable agreement to the contrary, to the attorneys who labored to earn them.  (See *Flannery*, *supra*, 26 Cal.4th at p. 590; see also *Henry M. Lee Law Corp. v. Superior Court* (2012) 204 Cal.App.4th 1375, 1388 [finding, "in accordance with *Flannery*," the same for attorney fees awarded under Lab. Code, §§ 1194, subd. (a), 226, subd. (e)]; *Lindelli v. Town of San Anselmo* (2006) 139 Cal.App.4th 1499, 1502 [finding, based on "the reasoning of the *Flannery* decision," the same for attorney fees awarded under Code Civ. Proc., § 1021.5].)

II

*The Parties' Fee Agreement*

We turn next to the parties' agreement to determine whether it altered this default disposition of attorney fee awards under section 3426.4.

The parties entered into two fee agreements over the course of this litigation.  The one relevant here governed from November 30, 2009, onward.  Under that agreement, Porter Scott agreed to provide legal services to TJG pro bono.  It also agreed to waive the majority of the $92,845.86 in legal fees incurred before the agreement, requiring only the payment of $25,000.  The agreement added in a footnote, however, that "[s]hould the Johnson Group or Chris Johnson be awarded fees in the future based on Porter Scott's underlying representation, all fees shall be reimburseable [*sic*] at that point and this waiver shall not apply."

14

Both parties construe this language as favoring their position. But before turning to their arguments about the contract's language, we consider first TJG's failed effort to introduce extrinsic evidence to support its reading of the agreement.

A. *Trial Court's Exclusion of Extrinsic Evidence*

TJG contends the trial court wrongly failed to consider its offered extrinsic evidence. In particular, it faults the court for failing to consider a portion of a transcript from the deposition of one of Porter Scott's attorneys. In that deposition, the deposed attorney mentioned that the one footnote in the parties' agreement should have been placed in a slightly different location. Again, that footnote provided: "Should the Johnson Group or Chris Johnson be awarded fees in the future based on Porter Scott's underlying representation, all fees shall be reimburseable [*sic*] at that point and this waiver shall not apply." This footnote was placed after a paragraph that noted the outstanding legal fees owed to Porter Scott as of November 30, 2009. But according to the deposed attorney, the footnote should instead have been placed after the next paragraph in the agreement, which concerned the waiver of some of these outstanding fees. She reasoned that the footnote about waiver plainly should have followed the paragraph about waiver. In TJG's view, the trial court committed reversible error in failing to admit this evidence.

We disagree. Courts, to be sure, must admit a party's offered extrinsic evidence if it is relevant to prove a contract is "reasonably susceptible" to the meaning the party alleges. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 ["The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is . . . whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."].) But TJG's offered extrinsic evidence fails to meet this standard. TJG understands the parties' agreement to entitle it, not Porter Scott, to any awarded attorney fees. But we find nothing in the deposition testimony about the misplaced footnote that is relevant to prove the agreement was

15

"reasonably susceptible" to this reading. And TJG, for its part, offers no explanation as to why we should find otherwise, other than its conclusion that "a different interpretation of the Pro Bono Agreement follows from its proper interpretation in light of the extrinsic evidence." Because that conclusion is not at all obvious in our view, we reject TJG's largely unexplained claim.

B. *Trial Court's Interpretation of the Agreement*

TJG next offers several arguments on why the trial court misinterpreted the parties' agreement.

First, because Porter Scott agreed to provide legal services pro bono, TJG contends the firm "gave up" its right to receive any fee award. We disagree. Again, as the *Flannery* court recognized, even attorneys who perform services pro bono may obtain "reasonable" attorney fees under a fee-shifting statute. (*Flannery*, *supra*, 26 Cal.4th at p. 585.)

Second, TJG asserts that, to the extent the contract is ambiguous on this point, the ambiguity must be construed in its favor as "everyone understood and believed that any future fee award would go to TJG." (See § 1649 ["If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."].)

In support of this argument, TJG cites portions of Johnson's deposition testimony, Johnson's father's declaration, and two Porter Scott attorneys' deposition testimony. All four of these individuals spoke of their understanding of the footnote in the parties' agreement. Johnson testified that he asked one of Porter Scott's attorneys about the footnote, and the attorney responded that "what this footnote means is that, in the event that you are awarded attorneys' fees, that you would have to pay back Porter Scott the $92,000. And that was it." Johnson's father, who was also present when the footnote was discussed, said something similar in a declaration: Porter Scott's attorney said that "if there was such an award then the law firm would be entitled to the fees that they were

16

writing off. She was specifically discussing the $92,000.00 . . . . She did not say that the law firm would keep anything above the $92,000.00 if the amount was higher."

Two Porter Scott attorneys also testified about the footnote, though in different terms. One attorney, who did not speak with Johnson about the fee agreement's footnote, said he understood the footnote as preserving Porter Scott's right, in the event the trial court awarded fees, to recover the waived fees of $67,845.86—the difference between the $92,845.86 TJG owed as of November 30, 2009, and the $25,000 it ultimately paid. In his words, "we wanted to reserve the right to be able to get that later." Another attorney, the one who spoke with Johnson about the footnote, said something similar: Porter Scott wanted to reserve its right "to seek that balance of [$]67,000 whatever, 845.86." She then added that the footnote was concerned more with Aerotek than TJG, explaining that "we didn't want . . . to empower Aerotek to claim that Porter Scott was not entitled to reimbursement for those fees simply because they had been waived as to Chris Johnson's requirement of paying them." The attorney further said she told Johnson that "should we win a fee motion in the future, he would be paid back the amount that he had already paid in fees to Porter Scott on this case." She said she also told Johnson something "to the effect" that he "could not recover anything more on an attorneys' fee award other than what [TJG] had already paid Porter Scott in attorneys' fees"—though she acknowledged she did not say those precise words.

Based on this testimony, TJG maintains that "everyone understood and believed that any future fee award would go to TJG." We disagree. To begin, TJG's argument here is premised on extrinsic evidence that the trial court refused to admit. Although TJG appealed the court's refusal to consider some of its extrinsic evidence, as discussed above, it did not appeal the court's refusal to consider the evidence it describes here. In any event, considering the offered testimony, we are not persuaded that everyone understood and believed that any future fee award would go to TJG. Everyone apparently understood that Porter Scott added the footnote to protect its right to obtain the

17

balance of the charged $92,845.86 in the event fees were awarded. We agree with that much. But according to TJG, everyone also understood that Porter Scott added the footnote intending, not only to reserve its right to these fees, but also to forfeit its right to all fees beyond the $92,845.86. In other words, in TJG's apparent view, Porter Scott unilaterally added the footnote in part to limit its potential fee recovery to $92,845.86. That view, however, finds no support in the attorney deposition testimony that TJG cites. Again, the two deposed Porter Scott attorneys both discussed the purpose of the footnote, and that purpose was to protect, not limit, Porter Scott's right to attorney fees. We thus reject TJG's characterization of what "everyone understood."[3]

Finally, in a one-sentence argument based on section 1654, TJG contends that "the language of a contract must be interpreted most strongly against [Porter Scott] as 'the party who caused the uncertainty to exist.' " We agree that, "[i]n cases of uncertainty not removed by [other rules of statutory interpretation], the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (§ 1654.) But TJG never identifies in its opening brief the language in the parties' agreement that it believes is uncertain and thus should be interpreted against Porter Scott. TJG instead waits until its reply brief to explain its position, clarifying there that its claim concerns Porter Scott's agreement to represent it pro bono. But because we find this argument was never adequately raised until TJG's reply brief, we find it forfeited. (See *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [claims raised for the first time in a reply brief, without good cause, are forfeited].)

Even if the argument were not forfeited, moreover, we would still reject the claim on the merits. A contract provision is ambiguous (or uncertain) when it is capable of two or more constructions, both of which are reasonable. (*Bay Cities Paving & Grading, Inc.*

---

[3]    Moreover, footnote 1, which refers to "this waiver" obviously belongs as a footnote to the waiver provisions of paragraph 5 of the agreement. There is no waiver in paragraph 4, to which footnote 1 is formally attached.

*v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867.) But we find no *relevant* ambiguity in Porter Scott's agreeing to charge TJG $0 for its services. And even supposing this language was ambiguous in some way, we would not find TJG's preferred reading a reasonable construction of this language. That the parties entered into an agreement about the amount Porter Scott could charge TJG for its services cannot reasonably be construed as an agreement that TJG would be entitled to all statutorily awarded fees. It had nothing to do with that topic. We thus reject TJG's claim under section 1654. (See *Katz v. Haskell* (1961) 196 Cal.App.2d 144, 158 ["The purpose of [§ 1654] is to explain [uncertain terms] and not add or subtract terms."].)

Porter Scott, for its part, asserts that it is "presumptively the owner" of the awarded fees based on *Flannery* and similar cases, and then contends that the parties' agreement is consistent with that presumption. But "whether or not" the parties' agreement lends further support to Porter Scott's position, we find dispositive that "attorney fees awarded pursuant to [section 3426.4] (exceeding fees already paid) belong, absent an enforceable agreement to the contrary, to the attorneys who labored to earn them" (*Flannery*, *supra*, 26 Cal.4th at p. 590), and that TJG has failed to show the parties' agreement altered that default disposition.

III

*TJG's Procedural Arguments*

TJG's remaining contentions focus on two alleged procedural flaws in the proceedings below.

First, TJG asserts that, per California's Mandatory Fee Arbitration Act (MFAA; Bus. & Prof. Code, § 6200 et seq.), Porter Scott needed to provide them with written notice of its right to arbitrate the fee dispute. And because Porter Scott did not, TJG contends we must reverse. We disagree.

"Under the [MFAA], when there is a fee dispute between an attorney and a client, the client may choose to submit the matter to arbitration by a local bar association."

19

(*Schatz v. Allen Matkins Leck Gamble & Mallory LLP* (2009) 45 Cal.4th 557, 561, fn. omitted.) This requirement applies to "disputes concerning fees, costs, or both, charged for professional services by licensees of the State Bar or by members of the bar of other jurisdictions." (Bus. & Prof. Code, § 6200, subd. (a).) But it is subject to certain exceptions, including one involving "[d]isputes where the fee or cost to be paid by the client or on his or her behalf has been determined pursuant to statute or court order." (*Id.*, subd. (b)(3).)

To the extent the dispute here concerns "fees . . . charged" to TJG by Porter Scott (Bus. & Prof. Code, § 6200, subd. (a)), we find it concerns fees "determined pursuant to statute" and thus is exempted from the MFAA's requirements. Again, as discussed above, we find the award of fees to Porter Scott, rather than TJG, follows from section 3426.4's default disposition of fees in favor of the attorney. And because the fee to be paid has thus "been determined pursuant to statute," the MFAA's arbitration requirement is expressly inapplicable. (Bus. & Prof. Code, § 6200, subd. (b)(3).)

TJG next contends the trial court denied it its constitutional right to a jury trial. We disagree here too.

Article I, section 16 of the California Constitution broadly provides that "[t]rial by jury is an inviolate right and shall be secured to all" in both criminal and civil actions. But the right is not as absolute as this text suggests. "[P]ast California cases make clear 'that the state constitutional right to a jury trial "is [limited to] the right as it existed at common law in 1850, when the [California] Constitution was first adopted." [Citations.]' " (*Shaw v. Superior Court* (2017) 2 Cal.5th 983, 994-995 (*Shaw*); see also *Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 315.) And so if a proceeding "did not entail a right to jury trial under the common law of 1850" or was "unknown to the common law of 1850," then that proceeding would not entail a constitutional right to a jury trial today. (*Crouchman v. Superior Court* (1988) 45 Cal.3d 1167, 1174 (*Crouchman*).)

20

To determine whether a proceeding entailed the right to a jury trial in 1850, courts often "rel[y] on the traditional distinction between courts at law, in which a jury sat, and courts of equity, in which there was no jury." (*Crouchman v. Superior Court*, *supra*, 45 Cal.3d at p. 1175.) " 'As a general proposition, "[t]he jury trial is a matter of right in a civil action at law, but not in equity." ' " (*Shaw*, *supra*, 2 Cal.5th at p. 995.) To determine whether a given action is one in law or equity, courts consider " ' " "the nature of the rights involved and the facts of the particular case—the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law.' " [Citation.] On the other hand, if the action is essentially one in equity and the relief sought "depends upon the application of equitable doctrines," the parties are not entitled to a jury trial. [Citations.]' " (*Ibid.*)

That background in mind, we consider whether the gist of the claim here is one in law or equity. We find it to be one in equity.

TJG, in effect, seeks a declaration that it—and not Porter Scott—is entitled to the awarded attorney fees. Actions seeking declaratory relief of this sort are at times legal in nature and at other times equitable in nature. If a party, for example, has been deprived of ownership of some property and then files an action to be declared the rightful owner, the action is triable in a court of law. (See *Thomson v. Thomson* (1936) 7 Cal.2d 671, 681 (*Thomson*).) That is because an action to recover property is one long recognized in the common law. (See *Berry v. Bank of Bakersfield* (1918) 177 Cal. 206, 209 [an action "for the recovery of specific personal property" is "the code equivalent of the common-law writ of replevin"].)

But if a party seeks to establish ownership of property "when the possession of the property is not involved," then the action is an equitable one. (*Thomson*, *supra*, 7 Cal.2d at p. 681; see also *Caira v. Offner* (2005) 126 Cal.App.4th 12, 23-29 (*Caira*) ["actions to quiet title, like true declaratory relief actions, are generally equitable in nature"]; *Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109 ["A quiet title action is equitable in nature

21

except when it takes on the character of an ejectment proceeding to recover possession of real property."].) And because that is the type of claim that TJG raises here—a claim seeking to establish ownership of a fee award when possession is not yet involved—TJG is not entitled to a jury trial. (*Thomson*, at p. 681; see also *Caira*, at pp. 26-29 [no jury required in a dispute involving who was entitled to certain stocks under an agreement]; *Campbell v. Rustigian* (1943) 60 Cal.App.2d 500, 501-503 [no jury trial required in a dispute over ownership of real property when neither of the parties yet held possession of the property].)[4]

In arguing otherwise, TJG mistakenly characterizes its claim as one for damages arising out of a breach of contract, and then contends that "any action for damages arising out of that contract by either party is an action at law" that warrants a jury trial. But TJG is not seeking damages at all. (See *Flannery*, *supra*, 26 Cal.4th at p. 586 ["Statutory attorney fees are not of course intended to compensate the 'prevailing party' for damages suffered."].) Nor is it alleging any breach of contract. The parties, to be sure, are in dispute over how their agreement should be interpreted; but TJG has not alleged that Porter Scott has done anything in violation of the parties' agreement. TJG's claim, rather than being one for damages following a breach of contract, is better characterized as one

---

[4] Porter Scott offers a separate reason for finding a jury trial inappropriate here: There was no conflict in the offered extrinsic evidence. We agree, as Porter Scott notes, that "[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence." (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439.) But we need not address whether the interpretation of the agreement here turns on the credibility of extrinsic evidence. Either way, because the gist of the claim here was an equitable one, TJG was not entitled to a jury trial. (See *Shaw*, *supra*, 2 Cal.5th at p. 995; see also *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 845-848 [plaintiff not entitled to jury trial on equitable contract claims, even though these claims turned in part on the credibility of conflicting extrinsic evidence].)

seeking specific performance—and that is a type of claim that courts have repeatedly found to be an " 'equitable one.' " (*Caira*, *supra*, 126 Cal.App.4th at p. 27.)

Finally, TJG contends it is entitled to a jury trial "because there are significant questions of fact that must be heard by a jury." In support, it asserts there are "factual questions related to [Porter Scott's] original legal advice that gave rise to Aerotek['s suit against TJG and Ponce]," "factual questions about whether [Porter Scott] had a conflict of interest and breached its fiduciary duty by representing TJG in the very case that arose out of the advice given by [Porter Scott]" and "by negotiating the Pro Bono Agreement," and "factual questions about whether [Porter Scott] made false and misleading representations to Johnson and his father on November 30, 2009 that either negligently or fraudulently induced Johnson to sign the Pro Bono Agreement under false pretenses." Only the first of these alleged factual issues, however, was raised in any meaningful way at the trial level. TJG never discussed the alleged conflict of interest at all before the trial court. And although it noted in its trial briefing that "this is a case that involves . . . fraud in the inducement and breach of fiduciary duty," it never followed up to explain the point. As a result, we find TJG's claim related to these alleged factual questions largely forfeited. (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997 [" '[a]s a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal' "]; see also *In re A.C.* (2017) 13 Cal.App.5th 661, 672 [when an appellant asserts a point " 'but fails to support it with reasoned argument and citations to authority, we treat the point as waived' "].)

To the extent TJG's claim that a jury trial is required "because there are significant questions of fact" is not forfeited, it does not alter our conclusion. Even in cases involving questions of fact, a jury trial is still unwarranted if the gist of the action is equitable in nature. Again, if an " 'action is essentially one in equity and the relief sought "depends upon the application of equitable doctrines," the parties are not entitled to a jury trial' "—and that is true even if the action raises questions of fact. (*Shaw*, *supra*, 2

23

Cal.5th at p. 995; see also *Benach v. County of Los Angeles, supra*, 149 Cal.App.4th at pp. 845-848 [finding no jury trial required to resolve an equitable contract claim, even though that claim turned in part on the credibility of conflicting extrinsic evidence].) And because we find that description fits here, we reject TJG's contention that it was entitled to a jury trial.

## DISPOSITION

The judgment is affirmed. Porter Scott is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

/s/

BLEASE, Acting P. J.

We concur:

/s/

MAURO, J.

/s/

BUTZ, J.*

---

*Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.